IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-23

No. 230A20

Filed 19 March 2021

IN THE MATTER OF: B.T.J.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 18 February 2020 by Judge Charlie Brown in District Court, Rowan County. This matter was calendared for argument in the Supreme Court on 11 February 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jane R. Thompson for petitioner-appellee Rowan County Department of Social Services.*

*McGuireWoods LLP, by Anita Foss, for appellee Guardian ad Litem.*

*Wendy C. Sotolongo, Parent Defender, by J. Lee Gilliam, Assistant Parent Defender, for respondent-appellant mother.*

HUDSON, Justice.

¶ 1 Respondent-mother appeals from the trial court's order terminating her parental rights to her minor child B.T.J. (Blake).[1] Since we conclude that the trial court properly adjudicated at least one ground for termination, we affirm the termination order.

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading.

¶ 2　　On 25 August 2017, the Rowan County Department of Social Services (DSS) filed a juvenile petition alleging that Blake was neglected and dependent. On that date, DSS responded to respondent-mother's hotel room after receiving a report that she had overdosed on heroin in Blake's presence. Eleven days earlier, respondent-mother had obtained a domestic violence protective order against Blake's father which also forbade him from having contact with Blake. As a result, neither of Blake's parents could provide care for him. DSS also alleged that Blake's parents both had an "intense and significant" history of substance abuse, which had previously necessitated a referral for in-home services on two occasions. DSS obtained nonsecure custody of Blake and placed him in foster care.

¶ 3　　On 15 February 2018, the trial court, with the consent of all parties, entered an order adjudicating Blake as a neglected and dependent juvenile. Respondent-mother was ordered to maintain safe and stable housing, comply with the recommendations of her substance abuse and mental health assessments, submit to random drug screens, participate in Blake's treatment if recommended by Blake's therapist, and sign releases of information needed to monitor her treatment progress. The order also provided respondent-mother with one hour of supervised visitation per week.

¶ 4　　On 4 April 2018, respondent-mother was found guilty of a felony drug charge, misdemeanor larceny, misdemeanor second-degree trespassing, and misdemeanor

child abuse. She was placed on thirty months of supervised probation. On 18 May 2018, respondent-mother was incarcerated, and she remained so until she entered inpatient substance abuse treatment on 24 October 2018. After her release from treatment on 21 January 2019, she continued to test positive for various controlled substances on 4 February 2019, 18 February 2019, 7 June 2019, and 1 July 2019.

On 29 July 2019, DSS filed a petition seeking to terminate respondent-mother's parental rights on the grounds of neglect and willfully leaving Blake in a placement outside the home for more than twelve months without making reasonable progress toward correcting the conditions that led to his removal. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019). In addition to chronicling respondent-mother's drug use, DSS also alleged that respondent-mother had difficulty maintaining consistent housing, employment, and visitation with Blake.

After a two-day hearing in early November 2019, the trial court entered an order on 18 February 2020 which terminated respondent-mother's parental rights. The trial court concluded that DSS had proven both alleged grounds for termination and that termination was in Blake's best interests. Respondent-mother appealed.[2]

On appeal, respondent-mother challenges both grounds for termination found by the trial court. She argues that in light of the severity of her addiction and the

---

[2] Blake's father's parental rights were also terminated in the 18 February 2020 order, but he did not appeal the trial court's order and is therefore not a party to this appeal.

amount of time she was incarcerated while this case progressed, the trial court failed to adequately credit the progress she made in remedying the problems which led to Blake's removal and the neglect adjudication.

¶ 8   When considering a petition to terminate parental rights, the trial court first makes an adjudicatory determination based on the alleged grounds for termination. *See* N.C.G.S. § 7B-1109 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2017)). "If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage," *id.* at 6, at which it "determine[s] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

¶ 9   We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citing *Koufman v.*

*Koufman*, 330 N.C. 93, 97 (1991)). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 10        Subsection 7B-1111(a)(1) permits a trial court to terminate a parent's rights if that parent is neglecting their child. A neglected juvenile is one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).

¶ 11        In some circumstances, the trial court may terminate a parent's rights based on neglect that is currently occurring at the time of the termination hearing. *See, e.g., In re K.C.T.*, 375 N.C. 592, 599–600 (2020) ("[T]his Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment."). However, in other instances, the fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.*, 373 N.C. 71, 80 (2019) (cleaned up). In such situations, "evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect— is admissible in subsequent proceedings to terminate parental rights[,]" but "[t]he trial court must also consider any evidence of changed conditions in light of the

evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715 (1984). After weighing this evidence, the trial court may find that neglect exists as a ground for termination if it concludes the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 851 S.E.2d 17, 20 (N.C. 2020) (citation omitted). Thus, even in the absence of current neglect, the trial court may adjudicate neglect as a ground for termination based upon its consideration of any evidence of past neglect and its determination that there is a likelihood of future neglect if the child is returned to the parent's care. *Id.* at 20 n.3.

¶ 12     There were no allegations in this case that respondent-mother was currently neglecting Blake at the time of the termination hearing. However, it is undisputed that Blake was out of respondent-mother's custody for an extended period of time and that he was previously adjudicated to be a neglected juvenile. Thus, our review focuses on whether the trial court correctly determined that there is a likelihood of future neglect if Blake is returned to respondent-mother's care.

¶ 13     When assessing whether there is a likelihood of future neglect, "the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212 (2019) (citing *In re Ballard*, 311 N.C. at 715). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the*

*time of the termination proceeding.*" *In re Z.V.A.*, 373 N.C. at 212 (quoting *In re Ballard*, 311 N.C. at 715).

¶ 14     Blake was previously adjudicated to be a neglected juvenile after he witnessed respondent-mother overdose on heroin in the hotel room where they were residing together, at which time he was in her care. In order to address the underlying causes of this adjudication, respondent-mother was ordered to complete a remediation plan which required her to participate in treatment for her drug addiction and stabilize her living situation. The termination order includes numerous unchallenged findings of fact clearly describing the limited progress respondent-mother made on this plan which are binding for purposes of appellate review. *In re T.N.H.*, 372 N.C. at 407. As described below, these binding factual findings reflect that respondent-mother had not adequately addressed her issues and at the time of the termination hearing, the likelihood of future neglect was "very high," as the trial court properly determined.

¶ 15     First, the unchallenged findings show that respondent-mother's substance abuse issues continued after Blake entered DSS custody. She was inconsistent in engaging in treatment until she entered Black Mountain Substance Abuse Treatment Center for inpatient treatment from 24 October 2018 to 21 January 2019. However, two weeks after respondent-mother completed this inpatient treatment program, she once again tested positive for controlled substances—and continued to do so. She tested positive for cocaine and marijuana on 4 February 2019, for buprenorphine

without a prescription on 18 February 2019, for marijuana on 7 and 28 June 2019, for marijuana and alcohol on 1 July 2019, and for alcohol on the first day of the termination hearing on 7 November 2019. Thus, while respondent-mother had no positive drug screens for approximately four months before the termination hearing was held, she had multiple positive screens in the weeks and months prior to that period, including soon after her discharge from inpatient drug treatment. Moreover, the four-month period of sobriety immediately prior to the termination hearing corresponded with respondent-mother's regular attendance at Rowan Treatment Associates, where she was receiving methadone treatment.

¶ 16    The trial court's unchallenged findings also reflect that respondent-mother's housing situation remained unstable. The trial court found that respondent-mother "changed homes several times during the history of this case" and proceeded to list more than a half-dozen such changes. By the time of the termination hearing, respondent-mother had been living in a one-bedroom trailer with her new husband for about two months. This housing situation was unsuitable, however. Respondent-mother's lease for that trailer only permitted three individuals to live there, and her stepdaughter was living with her and her husband every other weekend. During those times, Blake could not also reside in the trailer without violating the terms of the lease. Thus, as the trial court properly determined, respondent-mother's housing at the time of the termination hearing was inadequate.

¶ 17 The trial court's unchallenged findings also discuss other areas of concern. Respondent-mother was unable to maintain stable employment. She was fired from two separate jobs, with one of the firings resulting from her bringing her stepdaughter to work on a hot day without permission from her employer. Respondent-mother also withheld relevant information from DSS and her treatment provider. She did not inform DSS of her employment situation, her marriage, or her living situation, including that her stepdaughter stayed in her home on a regular basis. Respondent-mother did not sign a release of information for Rowan Treatment Associates, and she did not tell her treatment provider about her involvement with DSS or that a release was needed.

¶ 18 When the termination hearing occurred, Blake had been in foster care for more than twenty-six months. While respondent-mother can point to some signs of progress in the months immediately preceding the termination hearing, these were merely her first steps toward addressing her issues. Troublingly, respondent-mother had relapsed just two weeks after leaving inpatient drug treatment and repeatedly tested positive for a variety of controlled substances over a five-month period. At the time of the termination hearing, respondent-mother had only been consistent with a treatment regimen and gone without a positive drug screen for four months, and she had only been in her current housing for two months, which was inadequate. She had not established stable employment. The trial court properly determined that

respondent-mother's tenuous, limited progress on the issues that directly led to Blake's prior adjudication was neither enough to rectify these issues nor enough to diminish the probability that Blake would likely be neglected again if he returned to her care. In *In re O.W.D.A.*, 375 N.C. 645 (2020), we noted that "evidence of changed conditions must be considered in light of the history of neglect by the parents and the probability of a repetition of neglect," 375 N.C. at 648 (quoting *Smith v. Alleghany Cnty. Dep't of Soc. Servs.*, 114 N.C. App. 727, 732 (1994)), and we held that although the respondent-father in that case may have made some recent, minimal progress on his case plan, "the trial court was within its authority to weigh the evidence and determine that these eleventh-hour efforts did not outweigh the evidence of his persistent failures to make improvements . . . and to conclude that there was a probability of repetition of neglect." *Id.* at 654. The same reasoning applies here. Taken together, the trial court's unchallenged findings support its conclusion that "[t]he probability of a repetition of neglect of the juvenile if returned to the home or care of [respondent-mother] . . . is very high."

¶ 19    Therefore, we conclude the trial court properly determined that respondent-mother's parental rights could be terminated based on neglect. Because we conclude this termination ground is supported, we need not address respondent-mother's arguments as to N.C.G.S. § 7B-1111(a)(2), the remaining ground found by the trial court. *See In re A.R.A.*, 373 N.C. 190, 194 (2019) ("[A] finding of only one ground is

necessary to support a termination of parental rights . . . .”). We affirm the trial court's

order terminating respondent-mother's parental rights.

AFFIRMED.